Gulf Shipbuilding Corporation v. Commissioner.
Gulf Shipbuilding Corp. v. Commissioner
Docket No. 3998.
United States Tax Court
1945 Tax Ct. Memo LEXIS 138; 4 T.C.M. (CCH) 724; T.C.M. (RIA) 45248; June 28, 1945
Brooks Fullerton, Esq., for the petitioner. Henry C. Clark, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies of $6,259.62, $780.08 and $6,470.85 in income, declared value excess profits and excess profits taxes, respectively, for 1941. The sole issue, others raised by the pleadings having been abandoned or conceded upon brief, is the basis of certain real estate for amortization purposes under section 124 of the Internal Revenue Code. The facts set forth in a stipulation of facts filed by the parties are found as so stipulated and material parts thereof are included with findings of fact made from other evidence. Findings of Fact The petitioner, an Alabama corporation, was organized November 12, 1938, for *139 the purpose of building ships. It kept its books and filed its returns (with the collector for the district of Alabama as to 1941) on the accrual basis and on the basis of the calendar year. Except for a few shares in the hands of directors the capital stock of petitioner was owned by the Waterman Steamship Corporation. The Waterman Steamship Corporation made advances to petitioner and in about November 1940 received shares of stock of petitioner for about $2,000,000 advanced to it. On November 14, 1938, petitioner purchased a shipyard on Chickasaw Creek, Alabama, six miles north of Mobile, which had been abandoned for nearly 25 years and was in a run down condition. Petitioner repaired the shipyard but did not acquire contracts to build ships until September 1940. In August 1940, a representative of the Navy Department inspected the shipyard, and Chickasaw Village, a community located about one mile from the shipyard, and containing about 260 acres of ground, improved by 302 houses constructed in 1917 and 1918 and badly in need of repairs. Chickasaw Village was owned by the Chickasaw Development Co., hereinafter referred to as "Chickasaw", it having acquired it in 1939. Petitioner *140 estimated that it would have at least 10,000 employees if its shipyard worked to capacity. The Alabama Drydock Company had a shipyard at Mobile, Alabama, and at one time employed 32,000 men. In August 1940 petitioner endeavored to purchase Chickasaw Village, but the owner refused to sell. The stock of Chickasaw was owned by two individuals who were not employees of or connected in any way with petitioner. On September 4, 1940, petitioner obtained an option to purchase all of the outstanding stock of Chickasaw for $105,000, exercisable by September 30, 1940, and paid $7,500 to apply on the purchase price. The option was extended, first to October 8, 1940, in connection with which an additional $2,500 was paid, and then to November 2, 1940, on about which date the balance of $95,000 was paid by petitioner and it received all of Chickasaw's stock. The total cost, $105,000, was set up on petitioner's books at the close of 1940 as "Investment in subsidiary - Chickasaw Development Co." On about September 4, 1940, petitioner was requested by the Navy Department to send a representative to Washington prepared to advise the Department whether it would undertake the construction of some *141 destroyers. On September 9, 1940, petitioner entered into a contract with the Navy Department to construct four destroyers at an estimated cost of about $28,000,000. At some undisclosed time petitioner earned a bonus for early delivery of ships built under contracts with the Navy Department. The cost of building the last destroyer under the contract was about 12 per cent less than the cost of the first one. Upon acquisition of the stock, reconditioning of Chickasaw Village was begun and all houses therein were made habitable. On July 1, 1941, 41 new units were under construction and during the next six months, the 41 units were practically completed and 50 additional units were begun. The housing of key men was essential to a ship construction program. During the period from November 2, 1940, to July 1, 1941, Chickasaw and petitioner had substantially the same officers and directors, the president, executive vice president and secretary and treasurer of the former, having held like offices in petitioner and the directors of Chickasaw constituted seven of the nine directors of petitioner. On March 26, 1941, Chickasaw applied to the Navy Department for a certificate of necessity *142 in respect of Chickasaw Village but could not obtain it because it had not acquired the property since June 10, 1940. Petitioner then consulted an accounting firm for advice on how best to proceed. A short time thereafter Chickasaw and petitioner, for the first time, considered the question of transferring Chickasaw Village to petitioner. At a meeting of the board of directors of Chickasaw, held on June 30, 1941, it was resolved that the real estate of the corporation should be "sold" to petitioner upon the terms of a proposed agreement read at the meeting. Like action was taken by the board of directors of petitioner on the same day for the "purchase" of the assets. The agreement read at the meeting was executed June 30, 1941. It provided that Chickasaw agreed to "sell" and petitioner agreed to "purchase" from it, all of its real estate for $622,765.59, payable as follows: Cash
$ 52,733.85
Assumption of mortgage
167,531.74
Asumption of debt to bank
112,500.00
Cancellation of note
290,000.00 Petitioner also agreed to assume a contract with H. A. Spencer and pay him $17,000 payable thereunder and reimburse Chickasaw $1,000 for a payment made to Spencer in June *143 1941 and for additions to the property made or paid during June 1941. Interest, taxes and insurance were to be prorated as of June 30, 1941. The amount of $622,765.59 was the book value of $558,868.24 of the property on May 31, 1941, less reserve for depreciation in the amount of $41,102.65, plus $105,000. The excess of $105,000 over book value was credited to surplus on Chickasaw's books as profit on the sale. The cost of additions to the property in June 1941 was $68,668.41, less reserve for depreciation of $2,539.98, net amount, $66,128.43. These figures include a duplicate charge of $3,560.93 for which petitioner received a credit. The assets were transferred to petitioner for the purpose of placing it in a position to apply to the Navy Department for a certificate of necessity. The assets acquired at the contract figure of $622,765.59 were entered in the books of petitioner at amounts aggregating such amount. The additions made by Chickasaw in June 1941 were entered in petitioner's books at figures aggregating $66,844.38, in connection with which credit entries, aggregating $715.95 were made, leaving $66,128.43 as an amount payable to Chickasaw. In addition to the real estate, *144 on June 30, 1941, petitioner acquired certain personal property from Chickasaw. The property was recorded on the books of both corporations in the amount of $58,667.22. On or about July 1, 1941, all of the assets of Chickasaw were transferred to petitioner and the petitioner assumed liabilities of Chickasaw in the amount of $303,568.73, which liabilities were paid as they became due. On July 23, 1941, petitioner released Chickasaw of liabilities of $340,000, which it had advanced to it and transferred to amount to an account on its books entitled "Housing Division," as of June 30, 1941. In July and September 1941, petitioner paid a total of $100,431.58 in cash to Chickasaw as follows: July 2 - $25,000; July 11 - $17,000; July 19 - $5,300; September 6 - $53,131.58; out of which Chickasaw paid liabilities of $47,028.77, which had not been assumed by petitioner. On September 6, 1941, Chickasaw transferred $52,700 in cash to petitioner. The item was set up on the books of Chickasaw as an account receivable and upon the books of petitioner as an account payable. In January 1942, Chickasaw paid a corporation permit fee of $20, and in March 1942, paid a franchise tax of $70, in each case *145 to the State of Alabama. At a date not shown, the United States Government built houses all around Chickasaw Village, and this protected the village against undesirable people. On July 31, 1942, petitioner paid taxes owed by Chickasaw in the amount of $5,844.52 and deposited $46,855.48 to the credit of Chickasaw in a bank. These items were recorded on petitioner's books as debits to the account payable of $52,700, and balanced that account. As of September 30, 1942, Chickasaw by check for $46,868.14 transferred all of its assets, consisting of cash in bank, to the petitioner, surrendered its charter, dissolved and canceled all of its outstanding stock. Balance sheets of Chickasaw disclose the following assets and liabilities on the dates shown: ASSETS
Oct. 31, 1940
Apr. 30, 1941
June 30, 1941
Apr. 30, 1942
Cash
$ 6,398.92
$ 252.65
$ 6,833.54 [1]
$ 12.66
Inventory
9,000.00
18,468.26
15,201.81
Real estate
316,464.59
499,119.88
583,894.02
Gulf Shipbuilding Corp.
52,700.00
Equipment
6,049.94
11,210.03
23,137.28
Miscellaneous Assets
14,639.08
17,178.03
20,328.13
Total
$352,552.53
$546,228.85
$635,727.70
$52,712.66
LIABILITIES
Accounts payable
$195,172.19
$ 6,626.28
$ 57,003.87
Mortgage
172,244.68
167,531.74
167,531.74
Notes payable: Bank
112,500.00
112,500.00
Gulf Shipbuilding
Corp.
270,000.00
340,000.00
Accruals
9,905.91
6,123.93
8,350.74
Reserve for income taxes
$ 5,844.52
Miscellaneous
66.06
20,051.01
1,955.21
Capital stock
35,000.00
35,000.00
35,000.00
35,000.00
Surplus
59,836.31 [1]
71,604.11 [1]
86,613.86 [1]
11,868.14
Total
$352,552.53
$546,228.85
$635,727.70
$52,712.66
*146 Chickasaw had operating losses each year of its existence. Its losses for the years ended April 30, 1940, and 1941, and for the period from April 30, 1941, to June 30, 1941, were $26,385.78, $45,025.59, and $14,943.08, respectively. Chickasaw had no material business transactions, was inactive and had no income after June 30, 1941. During 1941 the "investment in subsidiary - Chickasaw Development Co." was eliminated from petitioner's books by deduction of $46,700 for accounts payable and $58,300 for reserve for investment. No minutes were made by it after the minutes for the June 30, 1941, meeting. Petitioner filed an application with the Navy Department on August 12, 1941, for a certificate of necessity under the provisions of section 124 of the Internal Revenue Code. The application was approved and a certificate was issued to petitioner on March 11, 1942. In its return for the fiscal year ended April 30, 1942, Chickasaw reported a gain of $105,000 from the sale of real property on June 30, 1941. Opinion In its return for 1941, petitioner elected to amortize certain facilities, including the real property acquired from Chickasaw, *147 over a period of 60 months, as authorized by section 124 of the Internal Revenue Code. Of the amount claimed as a deduction, the respondent disallowed $10,500 upon the broad ground that it did "not constitute an allowable deduction from gross income." The amount disallowed is one-tenth (amortization for six months) of $105,000, the price petitioner paid for the stock of Chickasaw and the amount by which the alleged selling price of corporation's assets exceeded their book value. The sole difference between the parties is whether the amount of $105,000 constitutes a part of petitioner's basis for the assets for purposes of amortization. The position of respondent upon brief is that the transaction of June 30, 1941, under the terms of which petitioner acquired all of the assets of Chickasaw, constituted a liquidation under the provisions of section 112 (b) (6) of the Internal Revenue Code, and, accordingly, the basis of petitioner is the same as it would be in the hands of the transferor, as provided in section 113 (a) (15). There is no contest about the amount of basis which Chickasaw had in the property. The requirements of section 112 *148 (b) (6) (A) as to stock ownership, and of (C) as to transfer of property within the taxable year, are satisfied by the facts herein. The contention of petitioner is that the June 30, 1941, transaction was a sale of the property to it, resulting in a basis of $685,333.09, the purchase price of the assets, and that Chickasaw was not liquidated until September 30, 1942, fifteen months after the transfer, when the stock was surrendered and canceled. Petitioner had the burden of proving that it acquired the assets by purchase. It is well settled that the substance of a particular transaction controls in the application of the revenue statutes rather than the form thereof. The resolutions adopted by the boards of directors of Chickasaw and petitioner, and the contract entered into classify the transaction as a sale, but such designations are not conclusive. Gregory v. Helvering, 293 U.S. 465; Helvering v. Lazarus & Co., 308 U.S. 252; Commissioner v. Court Holding Co., 324 U.S. 331. Sales by a corporation to its sole stockholder may have their usual tax consequences if they are bona fide transactions. Jones v. Helvering, 71 Fed. (2d) 214; *149 Commissioner v. Eldridge, 79 Fed. (2d) 629. The entries made in the books of petitioner and Chickasaw for the transaction treat the transaction as a sale, but facts control over book entries. Doyle v. Mitchell Bros. Co., 247 U.S. 179. Petitioner became interested in the acquisition of Chickasaw Village as a housing facility for shipbuilding operations. Chickasaw refused to sell the property but its two stockholders, after some negotiation, gave petitioner an option to purchase their stock and the option was execised after petitioner had received a contract from the Navy Department to build destroyers. Petitioner thus acquired control of Chickasaw Village and was in a position to deal with the property in any manner it saw fit, and thereafter advanced large sums to Chickasaw for repairs to put the housing in condition for occupancy by its employees, chiefly key men. At that time, petitioner regarded itself as in substance the owner of Chickasaw Village. The original intention of petitioner seems to have been to permit Chickasaw to continue to own and operate the property as shown by the application filed by Chickasaw with the Navy Department for a certificate *150 of necessity to enable it to amortize the assets over a period of sixty months. The application was disapproved because Chickasaw acquired the property prior to June 10, 1940. Such action operated to deny Chickasaw the advantageous amortization deduction privileges of the statute, and petitioner, in its dilemma, sought the advice of an accounting firm. We do not know what advice it gave but consideration was promptly given to the matter of transferring the assets to petitioner, and such action was taken to place petitioner in a position to receive what was not available to its wholly-owned subsidiary. A transaction having the earmarks of a sale was decided upon in preference to some other form of transaction, the obvious purpose being to acquire a step-up basis for deductions from gross income. Petitioner had $105,000 invested in Chickasaw's stock. No real effort appears to have been made to ascertain the actual value of the assets of Chickasaw and as petitioner was Chickasaw's sole stockholder, it was in a position to fix the contract price for transferring the property. The price decided upon to accomplish its purpose was the book value of the property as of May 31, 1941, less *151 amounts charged to reserve for depreciation plus $105,000. Chickasaw reported a gain of $105,000 from the transaction, the amount being the difference between its cost basis of $627,536.65, less depreciation of $43,642.63, leaving an adjusted basis of $583,894.02, and an alleged sales price of $688,894.02. [1] Petitioner entered the assets on its books at a cost of $685,333.09. In some instances petitioner used the basis of Chickasaw, without adjustments for depreciation. There was a sufficient increase in other items to show a book value of $105,000 in excess of Chickasaw's adjusted basis. It was not a coincidence that the contract price was fixed at an amount exactly $105,000 in excess of Chickasaw's adjusted basis. Upon brief petitioner says that the application of Chickasaw for a certificate of necessity having been rejected on what to a layman might well have seemed technical grounds and having made a large investment in what might become a ghost town after the war, as it had after World War I, it was "certainly entitled to take the *152 steps necessary to bring petitioner within the protection intended to be afforded by Congress (by the enactment of section 124) for the purpose of stimulating investment by private capital in defense facilities" and that as the "price paid" was petitioner's out-of-pocket cost, the purchase price of the stock should be included in the base. Again the petitioner argues: Keeping in mind the special utility which the Village real estate had to petitioner there is ample evidence that the Village real estate was on June 30, 1941 worth at least the $685,333 paid therefor by petitioner. This figure has reality and integrity because it was arrived at on the basis of actual expenditures made by petitioner to persons over whom petitioner had no control. The first of these arm's length expenditures was the $105,000 paid by petitioner for the Chickasaw stock. * * * The petitioner also states on brief: * * * From any reasonable common sense viewpoint, petitioner's cost of purchasing the Chickasaw stock was just as much a component of its true economic cost of emergency facilities as the purchase of an additional crane or shipway at the yard itself. [Italics supplied.] It thus regards the *153 cost of the stock under the circumstances to be part of its cost of the assets subject to amortization. Section 124 (a) of the Internal Revenue Code provides, in part, that: "Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of any emergency facility (as defined in subsection (e)), based on a period of sixty months" and that such deduction shall be "in lieu of the deduction with respect to such facility * * * provided by section 23 (1), relating to exhaustion, wear and tear and obsolescence." It is provided in section 124 (f) that: * * * In determining, for the purposes of subsection (a) or subsection (h), the adjusted basis of an emergency facility - (1) There shall be included only so much of the amount otherwise constituting such adjusted basis as is properly attributable to such construction, erection, installation, or acquisition after December 31, 1939, * * *. The adjusted basis for determining gain is cost, with exceptions not here applicable. Section 113 (a) and (b). The statute in unequivocable terms makes the basis for amortization of the property *154 the same as the basis would be for the computation of gain. There is no indication that Congress intended to include in the determination of the basis any expenditures other than would ordinarily constitute a part of the cost of the asset, for gain or loss purposes. Deductions are a matter of legislative grace and are deductible only when plainly authorized. Helvering v. Inter-Mountain Life Ins. Co., 294 U.S. 686. The governing statute contains no authority for an item of cost not ordinarily includible in the basis. The cost of $105,000 of the stock of Chickasaw was carried on the books of petitioner at the close of 1940 as an investment in the corporation. During 1941 the asset was eliminated from the books by deductions of $46,700 for accounts payable and $58,300 for reserve for investment. Such adjustments on petitioner's books are inconsistent with the theory advanced here that the cost of the stock constitutes part of the cost of the corporation's assets. The stock gave petitioner no property right in the assets of Chickasaw other than a stockholder's interest, and the transfer of the assets to petitioner did not alter the situation for the stock continued to *155 be an asset, separate and distinct from the property of the corporation. Petitioner argues that if we regard the transaction as a whole the steps result in a purchase which includes the $105,000 as part of the cost of the assets. To carry out the theory to its logical conclusion would require a merger of the two items each for $105,000, one being the cost of the stock and the other a like amount by which the book value of the assets transferred was increased in the alleged sale. Obviously, there could not be such a merger since, under the petitioner's contention, Chickasaw was not liquidated at the time of the transfer, but continued as an entity until September 1942. If its corporate life did continue, petitioner continued to hold the stock with a cost basis to be reckoned with in a tax computation when it was disposed of by sale, surrendered in liquidation proceedings or otherwise. If we, on petitioner's theory, consider the stock as extant until September 1942, there is no logic in including the cost thereof in the basis of purchase of July 1, 1941. On the other hand, if the stock is considered as not so surviving the purchase, we think that a liquidation under section 112 *156 (b) (6) appears. In our opinion, even though Chickasaw was not dissolved and the stock actually canceled until September 1942, such liquidation is shown by the record. The reasons adduced for keeping the stock alive after July 1, 1941, are not convincing. They are, that use might be found for the corporation, and, if so, it would be cheaper to continue it than to organize another; also, that the officers considered possibly taking an option to buy land surrounding Chickasaw Village, to protect that property. No option in the name of Chickasaw was shown, and the Government accomplished that purpose by building houses, at a date not shown, so that it may have been before July 1, 1941. Such statements fail to demonstrate any real intent to continue Chickasaw as a going concern. As above seen, Chickasaw had no material transaction, no activity and no income after June 30, 1941. The officers of petitioner did not wish the Chickasaw stock in the first place. We think they eliminated it in the transaction June 30 and July 1, 1941. The investment of $105,000 in subsidiary Chickasaw Development Company, though set up on petitioner's books at the end of 1940, had on such books been eliminated *157 by the end of 1941. This is inconsistent with any idea that it served until September 1942. Liquidation may be complete, though there is no formal dissolution until later and a stockholder formally continues to hold stock. Frelmort Realty Corp., 29 B.T.A. 181, citing Wilmington Steamboat Co. v. Sturgess, 52 Fed. (2d) 210; Rollestone Corp., 38 B.T.A. 1093 (1105); William C. Hay, 2 T.C. 460 (470). Of the $100,431.58 cash received by September 6, 1941, from the petitioner, Chickasaw, after paying $47,028.77 liabilities not assumed by the petitioner, on September 6, 1941, returned $52,700 to the petitioner, thus leaving Chickasaw only $702.81 out of the $100,431.58. The record does not indicate that Chickasaw received or had any other cash. It had no cash on June 30, 1941. Thus, it appears that within a little more than two months after the sale petitioner received back $52,700 as against $52,733.85 paid by it upon the "purchase" of the real estate. Though the transaction was set up on the books of Chickasaw as an account receivable, and on petitioner's as an account payable, the fact remains that Chickasaw, unless it had cash not shown *158 by the record, was stripped in effect of all money received in connection with the "sale" on June 30, 1941. It is not without significance that on September 6, 1941, the petitioner had paid Chickasaw $53,131.58, and, as above noted, received back $52,700 on the same day. It had no income; was inactive. We should view this matter as a whole, and "undisguised by mere formalisms," Commissioner v. Court Holding Co., supra.So viewing it, we consider and hold that there is no bona fides in the inclusion of $105,000 in the alleged sale price of the Chickasaw assets, but a receipt of property in complete liquidation thereof to the petitioner as sole stockholder under section 112 (b) (6) of the Internal Revenue Code. We hold, therefore, that the Commissioner did not err in eliminating that amount from the petitioner's base and disallowing the item of $10,500 amortization deduction. Decision will be entered under Rule 50. Footnotes
1. Deflcit.↩
1. This figure differs from the basis claimed by petitioner on account of a failure to take into account the duplicate charge of $3,560.93.↩